# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# SAN ANGELO DIVISION

| | | |
|---|---|---|
| HEIDI L. WHITE and KRISTEN BELTRAN, individually and on behalf of all others similarly situated, | §<br>§<br>§<br>§ | Case No. 6:26-CV-00143-H |
| Plaintiffs, | §<br>§<br>§ | |
| v. | §<br>§ | **FIRST AMENDED CLASS** |
| MERCOR.IO CORPORATION (d/b/a MERCOR); DELVE TECHNOLOGIES, INC. (d/b/a DELVE); BERRIE AI INCORPORATED (d/b/a LiteLLM); and JOHN DOE LLM COMPANIES 1-10, | §<br>§<br>§<br>§<br>§<br>§<br>§ | **ACTION COMPLAINT** |
| Defendants. | §<br>§<br>§ | |

## I. INTRODUCTION

1.      Plaintiffs Heidi L. White ("White") and Kristen Beltran ("Beltran") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Mercor.io Corporation, d/b/a Mercor ("Mercor"), Delve Technologies, Inc., d/b/a Delve ("Delve"), Berrie AI Incorporated, d/b/a LiteLLM ("LiteLLM"), and John Doe LLM Companies 1–10 ("John Doe Defendants") (collectively, "Defendants"), and allege the following based upon personal knowledge as to their own acts and experiences, and upon information and belief as to all other matters.

2.      This action arises from one of the most consequential cybersecurity supply chain failures in recent history. On or about March 30, 2026, criminal hackers exfiltrated approximately four terabytes of sensitive personal data from Mercor's systems, including identity verification passports, recorded video interviews containing facial and voice biometric data, and the personal identifying information of thousands of individuals.

3.      The breach was not a random event. It was the foreseeable result of a chain of negligence and fraud that began with Delve, a compliance automation startup that reportedly fabricated security compliance certifications; continued through LiteLLM, which obtained its SOC 2 and ISO 27001 certifications from Delve in under 60 days; and culminated at Mercor, which incorporated LiteLLM into its technology stack without adequate security vetting.

1

4.    Each Defendant placed speed and cost savings above genuine security. Each Defendant represented to the public that it maintained robust data protection. Those representations were false. Plaintiffs and the putative class paid the price.

5.    This case is further distinguished by the systematic exploitation of contractor data by Mercor and the John Doe Defendants. Mercor required contractors to operate invasive monitoring software—including an application called Insightful—that randomly captured screenshots of contractors' computer screens during active work sessions, indiscriminately recording proprietary data belonging to contractors' other employers, clients, and personal accounts. Mercor then sold, licensed, or otherwise provided this captured data—along with contractors' personal information, recorded interviews, and work product—to the John Doe Defendants for use in training and developing large language models. On information and belief, the John Doe Defendants knew or should have known that the data they received from Mercor included data harvested through invasive surveillance practices and that the provenance of such data was tainted.

6.    Plaintiffs bring this action on behalf of a class of individuals whose personal data, proprietary data, confidential information, and/or trade secrets were compromised in the data breach disclosed on or about March 30, 2026. These class members suffered identical harms when Defendants' failures caused their data to be compromised, exfiltrated, and offered for sale on criminal marketplaces.

## II. PARTIES

**Plaintiffs**

7.     Plaintiff Heidi L. White is a natural person and citizen of the State of Texas, residing in Tom Green County, Texas. White has been engaged as an independent contractor on various projects on Mercor's platform since approximately October 2025. In connection with her onboarding, evaluation, and participation on the platform, White provided Mercor with highly sensitive personal and financial information, including but not limited to: her full name; date of birth; Social Security number; home address; e-mail address; phone number; and government-issued identification. White further provided a resume with employment and educational history, and recorded audio and/or video interview data on at least two occasions for varied position applications. White also established payment functionality through a third-party processor, Stripe, which required the provision of additional sensitive financial account information, including bank account and routing numbers. White's personal, financial, and biometric and/or interview-related data was accessed, exfiltrated, and/or otherwise compromised as a result of the data breach described herein. White did not misappropriate any proprietary data from any employer or client during her engagement with Mercor.

8.     Plaintiff Kristen Beltran is a natural person and citizen of the State of Colorado who resides in Douglas County, Colorado. Beltran was previously domiciled in the State of Texas during the time period in which she engaged with Mercor's platform. Beltran was engaged as an independent contractor on Mercor's platform

3

and completed at least one work trial in connection with that engagement. In connection with her onboarding, evaluation, and participation on the platform, Beltran provided Mercor with highly sensitive personal and financial information, including but not limited to: her full legal name; date of birth; Social Security number; home address; email address; phone number; and government-issued identification. Beltran also established payment functionality through a third-party processor, including Stripe, which required the provision of additional sensitive financial account information, including bank account and routing numbers. Beltran further provided employment and educational history, and recorded audio and/or video interview data. Beltran's personal, financial, and biometric and/or interview-related data was accessed, exfiltrated, and/or otherwise compromised as a result of the data breach described herein. Beltran did not misappropriate any proprietary data from any employer or client during her engagement with Mercor.

**Defendants**

9.      Defendant Mercor.io Corporation, doing business as Mercor, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 181 Fremont Street, 33rd Floor, San Francisco, California 94105. Mercor operates an AI-powered recruiting and talent platform that collects, stores, and processes sensitive personal data—including video interviews, identity documents, and behavioral AI assessments—from individuals nationwide. Mercor is valued at approximately $10 billion. Mercor manages over 30,000

contractors and provides training data to major AI companies. Mercor is a citizen of Delaware and California for purposes of diversity jurisdiction.

10.     Defendant Delve Technologies, Inc., doing business as Delve, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in California. Delve provides automated compliance certification services, marketing and selling SOC 2, ISO 27001, HIPAA, GDPR, and other compliance certifications to technology companies. Delve is a citizen of Delaware and California for purposes of diversity jurisdiction.

11.     Defendant Berrie AI Incorporated, doing business as LiteLLM, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in California. LiteLLM develops and maintains an open-source AI gateway proxy tool used by thousands of companies to manage connections to large language model providers. LiteLLM obtained its security compliance certifications through Delve. LiteLLM's Chief Executive Officer is Krrish Dholakia, and its Chief Technology Officer and Co-Founder is Ishaan Jaffer. LiteLLM is a citizen of Delaware and California for purposes of diversity jurisdiction.

12.     Defendants John Doe LLM Companies 1–10 ("John Doe Defendants") are corporations, limited liability companies, or other business entities that purchased, licensed, or otherwise obtained contractor data from Mercor for use in training and developing large language models and artificial intelligence systems. The true names and capacities of the John Doe Defendants are presently unknown to Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and

5

capacities of the John Doe Defendants when the same are ascertained. On information and belief, the John Doe Defendants knew or should have known that the data they received from Mercor included: (a) personal identifying information and biometric data of contractors obtained without adequate consent for AI training purposes; (b) proprietary data belonging to contractors' employers and clients, captured through Mercor's invasive Insightful screen monitoring software without the knowledge or consent of the data owners; and (c) work product generated under conditions of surveillance that captured data beyond the scope of the contractors' Mercor engagements. The John Doe Defendants' acceptance and use of this data, with knowledge or constructive knowledge of its tainted provenance, renders them liable to Plaintiffs and the Class.

## III. JURISDICTION AND VENUE

13.   This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) the proposed class contains more than 100 members; and (c) at least one member of the proposed plaintiff class is a citizen of a state different from at least one Defendant. Plaintiffs are citizens of Texas and Colorado, respectively, and all named Defendants are citizens of Delaware and California. The citizenships of the John Doe Defendants are presently unknown but are believed to be diverse from at least one Plaintiff.

14.    This Court has personal jurisdiction over each Defendant. Each Defendant has conducted substantial business throughout the United States, including in this District. Mercor engaged Plaintiff White and other Texas residents as contractors through its platform and collected their personal data in this District. Each Defendant's tortious conduct has caused injury to persons residing in this District.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and pursuant to 28 U.S.C. § 1391(b)(3) because each Defendant is subject to personal jurisdiction in this District.

16.    The San Angelo Division is proper pursuant to 28 U.S.C. § 124(a)(6) and Local Rule 3.2 of the Northern District of Texas because Plaintiff White resides in Tom Green County, Texas, which is within the San Angelo Division.

## IV. FACTUAL ALLEGATIONS

### A.  Delve's Fraudulent Compliance Scheme

17.    Delve marketed itself as the fastest compliance automation platform in the industry, claiming to deliver SOC 2, ISO 27001, HIPAA, and GDPR certifications in as little as days or weeks—rather than the six to twelve months required through legitimate compliance processes.

18.    Delve raised approximately $32 million in venture capital funding. Delve was a Y Combinator-backed startup that used its affiliation with that prestigious accelerator to bolster its credibility in the market.

19. Beginning in or around 2023 and continuing through at least March 2026, Delve systematically fabricated compliance certifications for its customers. An investigation published in March 2026 revealed that Delve's compliance reports were generated from identical templates with pre-written auditor conclusions—prepared before customers provided any evidence of actual compliance.

20. At least 494 fabricated compliance reports have been identified. Delve generated fake evidence of board meetings, security tests, and compliance processes that never occurred. Delve utilized certification firms that rubber-stamped reports without conducting legitimate audits.

21. Companies processing protected health information ("PHI")—including companies in the healthcare, AI, and fintech sectors—relied upon Delve's fabricated HIPAA, SOC 2, and ISO 27001 certifications when representing to their customers, users, and partners that sensitive data would be handled securely.

## B. LiteLLM's Reliance on Fabricated Certifications

22. LiteLLM is a widely-used open-source AI gateway tool that provides developers a unified interface to access hundreds of AI models. LiteLLM's software is downloaded as many as 3.4 million times per day and is integrated into the technology stacks of thousands of companies.

23. LiteLLM obtained its SOC 2 Type II and ISO 27001 certifications through Delve's platform. LiteLLM's Chief Technology Officer and Co-Founder, Ishaan Jaffer, has publicly acknowledged that the company obtained both

certifications through Delve in under 60 days—a process that ordinarily requires six months to a year through legitimate auditors.

24.    LiteLLM prominently displayed these Delve-obtained certifications on its website and marketing materials, representing to customers and downstream users that LiteLLM maintained robust security controls in compliance with internationally recognized standards. These representations were material to the decisions of downstream users—including Mercor—to integrate LiteLLM into their technology infrastructure.

25.    These representations were false or misleading. LiteLLM's security certifications were obtained through a provider that fabricated compliance reports, and LiteLLM's actual security posture was insufficient to prevent the compromise described herein.

## C.  The LiteLLM Supply Chain Compromise

26.    In late March 2026, a threat actor known as TeamPCP—a hacking collective with suspected nation-state connections known for sophisticated supply chain attacks—compromised the PyPI publishing credentials for the LiteLLM library and injected a three-stage malicious backdoor into LiteLLM versions 1.82.7 and 1.82.8.

27.    The malicious code was designed to harvest authentication credentials and establish persistent system access. The malware successfully stole authentication credentials and accessed customer API keys from organizations that had integrated LiteLLM into their systems.

28.    Following the discovery of the compromise, LiteLLM severed ties with Delve and announced it would pursue recertification through Vanta, a legitimate compliance platform, with an independent third-party auditor. This remedial action constitutes an implicit acknowledgment that the Delve-obtained certifications were inadequate.

**D.  The Mercor Data Breach**

29.    Mercor is an AI-powered recruiting platform valued at approximately $10 billion. Mercor's platform collects and processes extraordinarily sensitive personal data from individuals seeking employment opportunities, including: identity verification passports and government-issued identification; Social Security numbers; recorded video interviews capturing facial and voice biometric data; behavioral AI assessments and scoring; full legal names, dates of birth, addresses, email addresses, and telephone numbers; employment and educational history; and financial account information including bank account and routing numbers collected through third-party payment processors such as Stripe. Mercor manages over 30,000 contractors and provides training data to major AI companies.

30.    Mercor utilized LiteLLM in its technology infrastructure. When LiteLLM was compromised through the supply chain attack, attackers exploited the resulting access to breach Mercor's systems.

31.    On or about March 30, 2026, a group posted on the Telegram messaging platform claiming to possess and offer for sale Mercor's data. The hacking group Lapsus$ (also known as DEV-0537)—the same group responsible for high-profile

breaches at NVIDIA, Microsoft, and Okta—subsequently claimed responsibility for the data exfiltration.

32.    The stolen data reportedly comprises approximately four terabytes of sensitive information, including: a 211-gigabyte user database; 939 gigabytes of platform source code; approximately three terabytes of storage buckets containing video interviews and identity verification passports; TailScale VPN configuration data; internal Slack communications; and ticketing system data.

33.    Mercor spokesperson Heidi Hagberg confirmed that the company experienced a security incident and stated that Mercor was "one of thousands of companies" affected by the LiteLLM compromise.

## E.  Mercor's Invasive Insightful Screen Surveillance

34.    Upon information and belief, Mercor required contractors to operate monitoring software during active work sessions, including an application called Insightful (formerly Workpuls), that randomly captured screenshots of contractors' computer screens at periodic intervals throughout the workday.

35.    These random screen captures indiscriminately recorded whatever was displayed on a contractor's screen at the moment of capture, including but not limited to: proprietary source code, trade secrets, and confidential business information belonging to the contractors' primary employers or other clients; personal email correspondence, private messages, and social media content; banking, financial, and medical information visible in browser windows or applications; and attorney-client privileged communications.

36. Mercor collected, stored, and retained these screen captures without adequate disclosure to contractors regarding the scope of data being collected, without obtaining informed consent from the owners of the proprietary data captured in the screenshots, and without implementing reasonable safeguards to prevent the capture and retention of data beyond the scope of the contractors' Mercor engagements.

37. Upon information and belief, Mercor sold, licensed, or otherwise provided contractor data—including personal information, recorded interviews, Insightful screen captures, and work product—to the John Doe Defendants for use in training and developing large language models. The screen capture data thereby transmitted to the John Doe Defendants contained proprietary information belonging to third parties who had no knowledge of or relationship with Mercor.

38. Notably, Mercor required contractors to execute an agreement requiring workers not to "improperly use or disclose to the Company Group any confidential, proprietary or secret information of Worker's former employer(s)." Yet Mercor's own Insightful screen monitoring software was designed to indiscriminately capture exactly such information from contractors' screens. Mercor thus imposed contractual obligations on its contractors that its own surveillance practices were engineered to circumvent.

39. Further, Mercor prohibited contractors from using "any AI Technology or the output of any AI Technology" without Mercor's written authorization, while Mercor simultaneously sold, licensed, or otherwise provided contractors' personal

data, work product, and Insightful screen captures to the John Doe Defendants for the express purpose of training AI models. This asymmetry—restricting workers' AI usage while monetizing their data for AI training without disclosure or consent—demonstrates Mercor's bad faith and further supports the deceptive practices claims alleged herein.

## F.  The John Doe LLM Companies' Knowledge and Participation

40.    On information and belief, the John Doe Defendants are companies engaged in the development and training of large language models and artificial intelligence systems that purchased, licensed, or otherwise obtained data from Mercor for use as training data.

41.    The John Doe Defendants knew or should have known that Mercor's data pipeline was tainted. Specifically, the John Doe Defendants knew or should have known that: (a) Mercor's invasive Insightful screen monitoring software captured data far beyond the scope of contractors' Mercor-related tasks, including proprietary data belonging to contractors' other employers and clients; (b) Mercor's contractor pool included individuals who may have had access to sensitive proprietary data from their employers, which Mercor's surveillance practices would have captured; (c) the volume and nature of data Mercor provided for AI training purposes was inconsistent with data legitimately generated solely through Mercor's platform; and (d) the provenance of the data could not be verified as having been lawfully obtained from all relevant data owners.

40.     By accepting and using this data with knowledge or constructive knowledge of its tainted provenance, the John Doe Defendants participated in and benefited from a scheme that violated the privacy rights of Plaintiffs and the Class and misappropriated proprietary data belonging to third parties.

41.     The John Doe Defendants owed a duty of care to Plaintiffs and the Class to conduct reasonable due diligence on the provenance and lawfulness of the training data they acquired. The John Doe Defendants breached this duty by failing to investigate or verify the lawfulness of the data pipeline from which they received contractor data.

## G.  Mercor's Pattern of Aggressive IP Acquisition

42.     Mercor's exploitation of contractor data is part of a broader pattern of aggressive intellectual property acquisition. On April 3, 2026, The Wall Street Journal reported that Mercor had approached professionals in the entertainment industry—including visual-effects artists who had worked on major studio productions—with offers to purchase their prior work materials. These professionals reported that they did not own the rights to the work Mercor sought to acquire, as such rights belonged to their prior employers under standard industry agreements. Multiple artists reported that the materials requested were subject to non-disclosure agreements and intellectual property assignments with studios.

43.     While Mercor's spokesperson stated that the company "does not buy intellectual property" and "only" licenses content from individuals who own it, Mercor did not require proof of ownership before acquiring such materials. This practice

14

mirrors the inadequate provenance verification described in this Complaint with respect to contractor data obtained through Mercor's platform, and further demonstrates Mercor's pattern of prioritizing data acquisition over legitimate IP due diligence.

## H. The Delve Whistleblower Evidence

44.   The fabrication of compliance certifications by Delve was confirmed by internal evidence made public in March 2026. A whistleblower provided internal recordings, screenshots, and Slack communications demonstrating that Delve's compliance reports were generated from identical templates with pre-written auditor conclusions prepared before customers provided any evidence of actual compliance. While Delve's leaders tried to downplay these documents as "templates," internal recordings captured Delve's CEO, Karun Kaushik, dismissing concerns about whether audit partners had reviewed any evidence.

## I. Harm to Plaintiffs and the Putative Class

45.   Plaintiff White is a Texas resident and independent contractor who has been engaged on Mercor's platform since approximately October 2025, during which she provided Mercor with highly sensitive personal and financial data, including her Social Security number, government-issued identification, bank account and routing numbers (through Stripe), recorded audio and/or video interview data on at least two occasions capturing her face and voice, and a resume with employment and educational history. White was also subject to Mercor's Insightful screen capture

15

monitoring during active work sessions. White's engagement since October 2025 resulted in a substantial accumulation of personal data within Mercor's systems.

46.    Plaintiff Beltran is a Colorado resident, formerly domiciled in Texas, who provided Mercor with highly sensitive personal and financial data, including her Social Security number, government-issued identification, bank account and routing numbers (through Stripe), recorded audio and video interview data, and employment and educational history.

47.    As a direct and proximate result of the breach, Plaintiffs' personal data—including biometric-grade data that cannot be changed, cancelled, or "frozen" like a credit card number or password—is now in the possession of sophisticated criminal actors who are actively offering it for sale on dark web marketplaces and Telegram channels.

48.    Plaintiffs have suffered and will continue to suffer: (a) invasion of privacy; (b) theft and loss or diminished value of their PII; (c) loss of the benefit of the bargain in providing data to Mercor in exchange for services, with the expectation that such data would be secured; (d) loss of privacy in sensitive biometric, identity, and financial data; (e) imminent and ongoing risk of identity theft, financial fraud, and unauthorized access to financial accounts; (f) out-of-pocket costs for credit monitoring, identity protection services, passport replacement, and financial account security measures; (g) time and effort spent monitoring financial accounts, credit reports, and mitigating the consequences of the breach; (h) experiencing an increase

in spam calls, texts, and/or emails; (i) statutory and nominal damages; and (j) emotional distress, anxiety, and loss of peace of mind.

49.    Additionally, as a direct and proximate result of the breach, Plaintiffs and the Class have suffered and will continue to suffer the continued risks of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

50.    Plaintiffs' injuries are concrete, particularized, and actual or imminent, satisfying the requirements of Article III standing. Unlike a breach involving only email addresses or passwords, the exposure of Social Security numbers, bank account and routing numbers, government-issued identification, passport images, and facial and voice biometric data from video recordings creates both immediate financial risk and irreversible harm that cannot be fully mitigated by conventional measures such as credit monitoring or password changes.

## V. CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following classes:

**Nationwide Class:** All persons in the United States whose personal data, proprietary data, confidential information, and/or trade secrets were compromised in the data breach disclosed on or about March 30, 2026.

**Texas Subclass:** All persons residing in Texas who satisfy the criteria of the Nationwide Class.

17

Excluded from the Class and Subclass are: Defendants and their officers, directors, and employees; any entity in which a Defendant has a controlling interest; Defendants' legal representatives, successors, and assigns; contractors who knowingly misappropriated proprietary data, trade secrets, or confidential business information belonging to their employers, clients, or third parties during their engagement with Mercor; the judicial officers assigned to this matter; and members of their immediate families and associated court staff.

52.    The exclusion of contractors who knowingly misappropriated proprietary data, trade secrets, or confidential business information is appropriate because the data breach exposed certain Mercor contractors who had improperly used Mercor's platform to channel proprietary data from their primary employers or clients—conduct that Mercor's inadequate oversight failed to prevent. Those individuals may face unclean-hands defenses that could complicate class proceedings. By limiting the class to contractors who acted ethically, Plaintiffs ensure that the Class is composed of individuals whose injuries flow entirely from Defendants' misconduct rather than from any independent wrongdoing of their own, thereby strengthening class certification under Rule 23 and eliminating potential affirmative defenses based on the contributory misconduct of individual class members.

**Rule 23(a) Requirements**

53.    **Numerosity (Rule 23(a)(1)).** The Class is so numerous that joinder of all members is impracticable. Mercor's platform serves thousands of users nationwide, and the breach compromised a 211-gigabyte user database. Upon information and belief, the Class includes tens of thousands of individuals.

54.    **Commonality (Rule 23(a)(2)).** There are questions of law and fact common to the Class that predominate over any questions affecting individual

18

members. Common questions include, but are not limited to: (a) whether Defendants owed a duty of care to Plaintiffs and the Class; (b) whether Delve fabricated compliance certifications relied upon by LiteLLM and, indirectly, by Mercor; (c) whether Defendants' conduct was negligent, deceptive, or fraudulent; (d) whether Defendants' representations regarding data security were false or misleading; (e) whether the breach was foreseeable and preventable; (f) whether Mercor's Insightful screen monitoring practices constituted an invasion of privacy; (g) whether the John Doe Defendants knew or should have known that data received from Mercor was tainted; (h) whether Plaintiffs and the Class suffered legally cognizable injury; and (i) the appropriate measure of damages.

55.    **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of the Class. Like all Class members, Plaintiffs provided personal data to Mercor, that data was compromised due to the identical chain of events (the Delve compliance fraud, the LiteLLM supply chain attack, and the Mercor breach), and Plaintiffs suffered the same categories of harm.

56.    **Adequacy (Rule 23(a)(4)).** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with those of the Class, and Plaintiffs have no interests antagonistic to or in conflict with the Class. Plaintiffs have retained competent counsel experienced in class action litigation, including class actions in the Northern District of Texas.

19

**Rule 23(b) Requirements**

57.    **Predominance (Rule 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members of the Class. The central issues—whether Defendants' conduct was negligent, deceptive, or fraudulent; whether the breach was caused by the Delve-LiteLLM-Mercor chain; whether the John Doe Defendants knowingly received tainted data; and whether the Class suffered harm—are common to all Class members and can be resolved on a class-wide basis.

58.    **Superiority (Rule 23(b)(3)).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation would be impracticable given the large number of affected persons and the relatively modest individual damages in comparison to the cost of litigation. Concentrating this litigation in a single forum will promote judicial economy and avoid the risk of inconsistent adjudications.

59.    **Injunctive and Declaratory Relief (Rule 23(b)(2)).** Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole. Specifically, Plaintiffs seek an order requiring Defendants to implement and maintain adequate data security practices and to cease the invasive monitoring and data-sharing practices described herein.

## VI. CAUSES OF ACTION

## COUNT I

## NEGLIGENCE

### *(Against Defendant Mercor)*

60.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

61.    Mercor owed Plaintiffs and the Class a duty to exercise reasonable care in the collection, storage, and protection of their personal data, including implementing and maintaining reasonable security measures commensurate with the sensitivity of the data collected. This duty arose from the special relationship between Mercor and its contractors, Mercor's affirmative collection of highly sensitive data, industry standards including NIST Cybersecurity Framework 2.0 and CIS Critical Security Controls, the FTC Act § 5 (15 U.S.C. § 45), the Gramm-Leach-Bliley Act, and the Restatement (Second) of Torts § 302B.

62.    Mercor breached this duty by failing to implement adequate security measures to protect the sensitive personal data in its possession, including but not limited to: (a) failing to adequately vet third-party dependencies such as LiteLLM before incorporating them into its technology stack; (b) failing to implement adequate data minimization practices; (c) failing to implement adequate access controls, encryption, and network segmentation; (d) failing to maintain an adequate and timely incident response process; and (e) failing to conduct adequate and regular security audits of its systems and third-party integrations.

21

63.    There is a close causal connection between Mercor's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Mercor's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

64.    As a direct and proximate result of Mercor's negligence, Plaintiffs and the Class have suffered actual damages as described herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach. Plaintiffs and Class Members are also entitled to injunctive relief requiring Mercor to strengthen its data security systems and monitoring procedures, submit to future annual audits, and provide adequate credit monitoring to all Class Members.

**COUNT II**

**NEGLIGENCE**

*(Against Defendant LiteLLM)*

65.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

66.    LiteLLM owed a duty of care to the users of systems that integrated its software, including Plaintiffs and the Class. LiteLLM knew or should have known that its software would be integrated into platforms that collected and processed

22

sensitive personal data, and that a compromise of LiteLLM's systems would foreseeably result in harm to those individuals.

67.    LiteLLM breached this duty by: (a) failing to implement adequate security controls over its software supply chain, including the PyPI publishing credentials that were compromised; (b) relying on fabricated compliance certifications from Delve rather than conducting genuine security assessments; and (c) failing to detect and prevent the injection of malicious code into its software packages in a timely manner.

68.    LiteLLM's breach of duty was a proximate cause of the Mercor data breach and Plaintiffs' resulting injuries.

69.    As a direct and proximate result of LiteLLM's negligence, Plaintiffs and the Class have suffered actual damages as described herein.

## COUNT III

### NEGLIGENT MISREPRESENTATION

*(Against Defendant Delve)*

70.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

71.    Delve was in the business of supplying information—namely, security compliance certifications—for the guidance of others in their business transactions. Delve supplied false information to LiteLLM and hundreds of other companies in the form of fabricated SOC 2, ISO 27001, and other compliance certifications.

23

72. Delve failed to exercise reasonable care or competence in obtaining or communicating the information contained in its compliance certifications. At least 494 compliance reports were generated from identical templates with pre-written conclusions, without regard to the actual security posture of Delve's customers.

73. Delve intended and knew that its compliance certifications would be relied upon not only by its direct customers but also by a broader, foreseeable class of persons—including its customers' clients, partners, and end users—in their decisions to entrust personal data to platforms utilizing Delve-certified technology. Plaintiffs fall squarely within this foreseeable class of reliance.

74. Plaintiffs justifiably relied on the chain of compliance representations that originated with Delve's fabricated certifications. Mercor's and LiteLLM's advertised compliance certifications—which Plaintiffs relied upon in deciding to provide their data—were the direct product of Delve's fraudulent work.

75. As a direct and proximate result of Delve's negligent misrepresentations, Plaintiffs and the Class suffered pecuniary loss as described herein.

## COUNT IV

## FRAUD

*(Against Defendant Delve)*

76. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

77.    Delve made material misrepresentations of fact by issuing compliance certifications stating that its customers, including LiteLLM, had achieved genuine compliance with SOC 2, ISO 27001, and other security frameworks. These certifications were based on fabricated evidence, pre-written auditor conclusions, and sham audit processes.

78.    These misrepresentations were false. At least 494 fabricated compliance reports have been identified. Delve generated fake evidence of board meetings, security tests, and processes that never occurred.

79.    Delve made these misrepresentations knowingly, or with reckless disregard for their truth or falsity. Delve's business model depended on producing certifications at a speed and price point that were incompatible with genuine compliance assessment.

80.    Delve intended that its certifications be relied upon by its customers and by the downstream users and consumers of its customers' services.

81.    Plaintiffs and the Class justifiably relied on the chain of compliance representations that originated with Delve's fabricated certifications. As a direct and proximate result, Plaintiffs and the Class suffered actual damages. Plaintiffs seek exemplary damages for Delve's intentional and knowing misconduct.

## COUNT V

## NEGLIGENCE

*(Against John Doe LLM Companies 1–10)*

25

82. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

83. The John Doe Defendants owed a duty of care to Plaintiffs and the Class to exercise reasonable diligence in the acquisition and use of training data, including verifying the lawful provenance of data purchased or licensed from third parties such as Mercor. This duty arose from the foreseeability of harm to the individuals whose data was being used and from industry standards and best practices governing the responsible acquisition of AI training data.

84. The John Doe Defendants breached this duty by: (a) failing to conduct reasonable due diligence on the provenance of data acquired from Mercor; (b) failing to investigate whether the data included proprietary information captured through invasive surveillance practices; (c) failing to verify that adequate consent had been obtained from all persons whose data was included in training datasets; and (d) accepting and using data that they knew or should have known was tainted by Mercor's invasive monitoring practices and inadequate data governance.

85. The John Doe Defendants' breach of duty was a proximate cause of Plaintiffs' injuries, including the continued unauthorized use and exploitation of their personal data for AI training purposes without adequate consent, compensation, or security.

86. As a direct and proximate result of the John Doe Defendants' negligence, Plaintiffs and the Class have suffered actual damages as described herein.

## COUNT VI

## BREACH OF IMPLIED CONTRACT

*(Against Defendant Mercor)*

87.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

88.     When Plaintiffs and Class Members provided their Private Information to Mercor in exchange for Mercor's services, they entered implied contracts with Mercor under which Mercor agreed to reasonably protect such information.

89.     Mercor solicited, offered, and invited Class Members to provide their Private Information as part of Mercor's regular business practices. Plaintiffs and Class Members accepted Mercor's offers and provided their Private Information to Mercor.

90.     In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Mercor's data security practices complied with relevant laws and regulations and adhered to industry standards.

91.     Plaintiffs and Class Members paid money to Mercor or had wages withheld by Mercor with the reasonable belief and expectation that Mercor would use part of its earnings to obtain adequate data security. Mercor failed to do so.

92.     Plaintiffs and Class Members would not have entrusted their Private Information to Mercor in the absence of the implied contract between them and Mercor to keep their information reasonably secure.

27

93.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Mercor.

94.    Mercor breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

95.    As a direct and proximate result of Mercor's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

96.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

## COUNT VII

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Defendant Mercor)

97.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

98.    Every contract, including the implied contracts between Plaintiffs and Class Members and Mercor, contains an implied covenant of good faith and fair dealing.

99.    Mercor breached the implied covenant of good faith and fair dealing by: (a) failing to implement reasonable data security measures despite collecting extraordinarily sensitive personal data; (b) incorporating third-party software (LiteLLM) into its technology stack without adequate security vetting; (c) deploying invasive Insightful monitoring software that captured data far beyond the scope of

28

contractors' engagements; (d) selling or licensing contractor data to the John Doe Defendants without adequate disclosure or consent; and (e) placing its own financial interests above the reasonable expectations of its contractors regarding data privacy and security.

100.    Mercor's conduct deprived Plaintiffs and Class Members of the benefits of their implied contracts with Mercor and frustrated the purpose of those contracts.

101.    As a direct and proximate result of Mercor's breach of the implied covenant, Plaintiffs and Class Members suffered actual damages as described herein.

## COUNT VIII

## INVASION OF PRIVACY — INTRUSION UPON SECLUSION

*(Against Defendants Mercor and John Doe LLM Companies 1–10)*

102.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

103.    Plaintiffs and Class Members had a reasonable expectation of privacy in their personal data, including their personal identifying information, biometric data captured in video interviews, financial information, and the contents of their computer screens during work sessions.

104.    Mercor intentionally intruded upon the seclusion of Plaintiffs and Class Members by: (a) deploying the Insightful screen capture software to indiscriminately record the contents of contractors' computer screens, including proprietary data, personal communications, financial information, and other sensitive content unrelated to Mercor engagements; (b) collecting, storing, and retaining data far in

29

excess of what was necessary or disclosed to contractors; and (c) selling or licensing this data—including data captured through invasive surveillance—to the John Doe Defendants.

105.    The John Doe Defendants intentionally intruded upon the seclusion of Plaintiffs and Class Members by acquiring and using data that they knew or should have known had been obtained through invasive and unauthorized surveillance of contractors' private activities.

106.    These intrusions would be highly offensive to a reasonable person. The capture and commercial exploitation of private data from contractors' personal screens, including data belonging to third parties, goes far beyond any reasonable monitoring of work performance.

107.    As a direct and proximate result of Defendants' intrusion upon seclusion, Plaintiffs and Class Members have suffered actual damages, including but not limited to loss of privacy, emotional distress, and the unauthorized commercial exploitation of their personal and proprietary data.

## COUNT IX

## BREACH OF FIDUCIARY DUTY

*(Against Defendant Mercor)*

108.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

109.    Mercor owed fiduciary duties to Plaintiffs and the Class arising from the special relationship of trust and confidence created by Mercor's collection and custody

30

of their highly sensitive personal data, including biometric data, financial account information, and government-issued identification. Plaintiffs and the Class reposed trust and confidence in Mercor to safeguard this data, and Mercor accepted this trust by collecting, storing, and profiting from the data.

110.   Mercor breached its fiduciary duties by: (a) failing to implement reasonable security measures to protect the personal data entrusted to it; (b) monetizing contractor data through sales or licenses to the John Doe Defendants without adequate disclosure or consent; (c) deploying invasive surveillance software that captured data beyond the scope of contractors' engagements; and (d) prioritizing its own financial interests over its duty of loyalty to the contractors whose data it held in trust.

111.   As a direct and proximate result of Mercor's breach of fiduciary duty, Plaintiffs and the Class have suffered actual damages as described herein.

## COUNT X

## NEGLIGENCE PER SE

*(FTC Act § 5, 15 U.S.C. § 45, and ITEPA, Tex. Bus. & Com. Code § 521.001 et seq.)*

*(Against Defendant Mercor)*

112.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

113.   Section 5 of the FTC Act (15 U.S.C. § 45) prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC has repeatedly enforced Section

against companies that fail to implement reasonable data security measures, establishing that inadequate data security constitutes an unfair practice.

114.    The Texas Identity Theft Enforcement and Protection Act, Tex. Bus. & Com. Code § 521.001 et seq., requires businesses that collect and maintain sensitive personal information of Texas residents to implement and maintain reasonable procedures to protect such information from unauthorized access, use, or disclosure.

115.    Mercor violated these statutory requirements by failing to implement and maintain reasonable security procedures commensurate with the extraordinary sensitivity of the data it collected, including biometric data, passport images, Social Security numbers, and financial account information.

117.    Plaintiff White and the Class are within the class of persons these statutes were designed to protect, and the harm they suffered is of the type these statutes were designed to prevent.

118.    Mercor's statutory violations constitute negligence per se, establishing the elements of duty and breach as a matter of law.

## COUNT XI

## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

*(Tex. Bus. & Com. Code § 17.41 et seq.)*

*(On Behalf of the Texas Subclass Against All Defendants)*

119.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

32

120. Plaintiff White and members of the Texas Subclass are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4) in that they sought or acquired goods or services from Defendants. Plaintiff White, as an independent contractor engaged through Mercor's platform, provided personal data—including biometric and identity verification data—as consideration for access to Mercor's services and employment opportunities.

121. Defendants engaged in false, misleading, or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.46(b), including but not limited to:

(a) Representing that goods or services have characteristics, uses, benefits, or qualities which they do not have (§ 17.46(b)(5))—specifically, that Defendants maintained adequate data security and held genuine compliance certifications;

(b) Representing that goods or services are of a particular standard, quality, or grade when they are of another (§ 17.46(b)(7))—specifically, that Defendants' data handling met industry security standards when it did not;

(c) Failing to disclose information concerning goods or services which was known at the time of the transaction with the intent to induce the consumer into a transaction the consumer would not have entered had the information been disclosed (§ 17.46(b)(24)).

122. Defendants' deceptive acts were a producing cause of actual damages to Plaintiff White and the Texas Subclass.

123. Defendants' conduct was committed knowingly or intentionally within the meaning of Tex. Bus. & Com. Code §§ 17.45(9) and (13), entitling Plaintiff White and the Texas Subclass to treble damages under § 17.50(b)(1).

124. Plaintiff White and the Texas Subclass are entitled to recover actual damages, treble damages, court costs, and reasonable and necessary attorneys' fees under Tex. Bus. & Com. Code § 17.50.

## COUNT XII

## CIVIL CONSPIRACY

*(Against All Defendants)*

125. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

126. Defendants, and each of them, acted in concert in a scheme that prioritized speed-to-market and cost savings over genuine data security compliance, with the foreseeable effect of leaving the personal data of thousands of individuals inadequately protected.

127. Delve and LiteLLM had a shared understanding and common design: Delve would produce expedited compliance certifications, and LiteLLM would accept and display those certifications as genuine, enabling both to profit from the arrangement. Mercor, in turn, relied upon and benefited from these representations in marketing its platform as secure.

128. Mercor and the John Doe Defendants had a shared understanding and common design: Mercor would collect contractor data—including data obtained

34

through invasive Insightful screen captures—and the John Doe Defendants would purchase, license, or otherwise obtain this data for AI training purposes, with each party profiting from the arrangement.

129. Each Defendant committed one or more overt acts in furtherance of this scheme, as described herein, which were independently tortious.

130. As a direct and proximate result of this conspiracy, Plaintiffs and the Class suffered actual damages.

## COUNT XIII

## UNJUST ENRICHMENT

*(Against All Defendants, in the Alternative)*

131. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

132. Plaintiffs and the Class conferred a benefit on Defendants by providing valuable personal data, including biometric data, identity documents, and personal information, which Defendants used to operate and market their respective platforms and services.

133. Mercor was further enriched by: (a) the avoidance of costs associated with implementing genuine security measures and conducting adequate vetting of third-party dependencies; and (b) the revenue derived from selling, licensing, or otherwise providing contractor data—including data captured through invasive Insightful monitoring—to the John Doe Defendants.

134.    The John Doe Defendants were enriched by receiving valuable training data derived from contractors' personal information, work product, and screen captures, which they used to develop and improve their AI systems.

135.    Mercor enriched itself by saving the costs it reasonably should have expended on data security measures. Instead of providing a reasonable level of security that would have prevented the hacking incident, Mercor instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit.

136.    Under the circumstances, it would be unjust for Defendants to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

137.    Plaintiffs and the Class are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT XIV**

**DECLARATORY JUDGMENT**

*(28 U.S.C. §§ 2201–2202)*

*(Against All Defendants)*

138.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

36

139.   An actual controversy has arisen and now exists between Plaintiffs, on behalf of themselves and the Class, and Defendants concerning the respective rights and duties of the parties.

140.   Plaintiffs contend that Defendants' existing data security practices are inadequate and continue to pose an ongoing risk of harm to Plaintiffs and the Class. Plaintiffs further contend that Mercor's Insightful screen monitoring practices and data-sharing arrangements with the John Doe Defendants violate the privacy rights of Plaintiffs and the Class.

141.   Plaintiffs seek a judicial determination and declaration that: (a) Defendants' data security practices, as alleged herein, were and continue to be inadequate and in violation of their legal obligations; (b) Mercor's Insightful screen monitoring practices constitute an unreasonable invasion of contractors' privacy; (c) Defendants are required to implement and maintain reasonable data security practices that comply with industry standards and applicable law; and (d) Defendants are required to provide adequate notification and obtain informed consent before deploying invasive monitoring technologies or sharing contractor data with third parties for AI training purposes.

142.   Such judicial determination is necessary and appropriate at this time so that the parties may ascertain their rights, duties, and obligations with respect to the data security practices at issue.

37

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court:

(A)   Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

(B)   Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(C)   Award Plaintiffs and the Texas Subclass treble damages pursuant to the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.50(b)(1);

(D)   Award exemplary and punitive damages against Defendant Delve for its fraudulent conduct;

(E)   Award restitution and disgorgement of profits against all Defendants;

(F)   Enter equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

(G)   Enter injunctive relief requiring Defendants to implement and maintain adequate data security practices, including independent security audits by legitimate third-party auditors not affiliated with Delve, and requiring Defendants to: (i) strengthen data security systems and monitoring

procedures; (ii) submit to future annual audits; (iii) provide adequate credit monitoring to all Class Members; (iv) delete, destroy, and purge personal identifying information unless Defendants can provide reasonable justification; (v) implement a comprehensive Information Security Program; (vi) engage independent third-party security auditors; (vii) segment data and create firewalls; (viii) establish information security training programs; (ix) implement logging and monitoring programs; and (x) for a period of 10 years, appoint a qualified independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis;

(H)    Enter an order requiring Defendants to provide identity theft protection and credit monitoring services to all Class members for a period of not less than ten (10) years;

(I)    Enter an order requiring Defendants to reimburse Class members for passport replacement costs, out-of-pocket expenses associated with identity theft prevention, and related identity document expenses;

(J)    Enter a declaratory judgment that Defendants' data security practices are inadequate and that Mercor's Insightful monitoring practices violate contractors' privacy rights;

(K)    Award Plaintiffs and the Class reasonable attorneys' fees, costs, and litigation expenses, including under the Texas DTPA;

(L)    Award Plaintiffs and the Class pre-judgment and post-judgment interest at the maximum rate allowed by law;

(M)   Award Plaintiffs service awards in recognition of their service as Class Representatives; and

(N)   Grant such other and further relief as this Court deems just and equitable.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable in this action.

Dated: April 8, 2026.                    Respectfully submitted.

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Texas Bar No. 24079396
andrew@hackerstephens.com
HEATHER G. HACKER
Texas Bar No. 24103325
heather@hackerstephens.com
HACKER STEPHENS LLP
108 Wild Basin Rd. South, Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2026, the foregoing First Amended Class Action Complaint was filed electronically with the Clerk of the Court using the CM/ECF system. No defendants have been served or have appeared in this action as of the date of this filing. Plaintiffs will serve all defendants with this First Amended Class Action Complaint and the appropriate summons pursuant to Fed. R. Civ. P. 4.

/s/ Andrew B. Stephens
ANDREW B. STEPHENS